Argued and submitted September 22, affirmed December 22, 1980

STEIN,
*Appellant,*
*v.*
BETA RHO ALUMNI ASSOCIATION, INC.,
*Respondent.*

(No. 77-4843, CA 16132)

621 P2d 632

Mary Ann Bearden, Eugene, argued the cause and filed the brief for appellant.

Randall Bryson, Eugene, argued the cause for respondent. With him on the brief were Bryson & Bryson, and Calkins & Calkins, Eugene.

Before Gillette, Presiding Judge, and Roberts and Campbell, Judges.

CAMPBELL, J. PRO TEMPORE.*

---

*Appointed to Supreme Court December 1, 1980.

## CAMPBELL, J.

Plaintiff filed this action seeking to recover damages for personal injuries alleged to have been suffered by her at a social party held at a fraternity house owned by the defendant corporation.[1] The plaintiff has appealed to this court from a judgment of involuntary nonsuit. We must decide if there is sufficient evidence from which the jury could have found that defendant Alumni Association was liable for the acts of the members of the local fraternity or for its failure to supervise those members. We find there is not and affirm.

■    In an appeal from a judgment of involuntary nonsuit we are required to view the evidence in the light most favorable to the plaintiff. *Kirby v. Sonville,* 286 Or 339, 594 P2d 818 (1979).

At the time of the incident in question the plaintiff was a 28-year-old burlesque dancer. She used the stage name of "Sweet Lady Jane." The Beta Rho Chapter of the Beta Theta Phi Fraternity employed the plaintiff to entertain at its stag Christmas party to be held on December 4, 1976. The Beta Rho Chapter occupied a house adjoining the mill stream on Patterson Street in the city of Eugene. The defendant owned the house.

The Christmas party was attended by from 40 to 60 members and pledges of the local fraternity. The plaintiff and her employe, Sandra Proudy, arrived at the fraternity house about 10 p.m.[2] They were met by a member and

---

[1] This case went to trial on the second amended complaint. The trial court file discloses that the only defendant in the original complaint was Beta Rho Chapter, Beta Theta Pi Fraternity. It was identified only as "a social fraternity recognized by the University of Oregon." The amended complaint added five individuals as parties defendants and they were identified as "active members or pledges in Defendant fraternity." The second amended complaint substituted Beta Rho Alumni Association, an Oregon corporation, for Beta Rho Chapter, Beta Theta Phi Fraternity as party defendant. Prior to the commencement of trial plaintiff notified the court that she had settled with one of the individual defendants and that the others were not served prior to the expiration of the statute of limitations. The case proceeded to trial with Beta Rho Alumni Association as the sole defendant.

[2] The plaintiff at trial described Sandra Proudy as follows:

escorted upstairs to his room which was to be used as a dressing room. The party was in progress. It was loud and boisterous. Alcoholic beverages had been and were being served. Some of the members or pledges were minors. A pornographic movie had been shown.

About 10:30 p.m. the plaintiff and Proudy went downstairs to start the plaintiff's entertainment. The conditions of employment laid down by the plaintiff included "enough space to do my show without bumping into anybody or anything * * * and that no one would touch me." On the way downstairs four to six young men informed the plaintiff that they would act as her "bodyguards." The plaintiff described the beginning of the entertainment act:

> "I came onto the stage and these young men were standing behind me, my so-called bodyguards, and the audience in front surged towards the stage. There was a lot of whooping and hollering.
>
> "I believe I was probably two minutes into my show, and it seemed every time I turned my back on my bodyguards that I would be getting a pinch or a slap on the butt, just a lot of harassment, and I found myself dealing not only with people in front of me on the stage grabbing at my ankles, and at my legs, but also the bodyguards grabbing at my rear."

The plaintiff's show was to include five musical numbers and run 16 to 18 minutes. The plaintiff stopped the performance twice — once to tell the "bodyguards" to get off the stage and once to stop some picture taking. The plaintiff did not finish her act because "the audience was getting out of hand."

Sandra Proudy and the plaintiff ran back up stairs to the dressing room. They locked the door. The plaintiff changed to her street clothes. People were rattling and banging the door and shouting obscenities. Other people climbed up the side of the house and banged on the windows while trying to take photos. The plaintiff was nervous and afraid. After approximately 30 minutes it "quieted

---

"Sandra? We jokingly called her my bodyguard, because she was [a] very big woman, she was six foot three. What she did, she picked up my clothes as I took them off, checked my lights, she ran the music, and she was there for moral support, someone to talk to."

down for a little while." Someone knocked on the door and said that he was the house president with a check for the plaintiff's services. The plaintiff opened the door and six or seven young men burst into the room. Proudy was shoved into a closet. They dragged, pulled and shoved the plaintiff who was fighting and kicking down the stairs to the outside of the building where 35 to 40 men were chanting "Rip her clothes off."

Once down stairs three or four of the young men dragged the resisting plaintiff 60 or 70 feet to a foot bridge over the mill race. The foot bridge is five or six feet above the water. The plaintiff is 5 feet 2 inches and weighs 110 pounds. She identified one of her attackers as being six feet two and weighing 200 pounds. The plaintiff testified:

"At this point, I was still fighting, I was really fighting, and they started fighting back. They started slapping me and a couple of them were grabbing me about the breasts. Somebody else grabbed me by the genitals. They started a chant of — it sounded to me like, 'Rape her,' and after I heard rip my clothes off, I was sure it was rape.

"They dragged me onto this bridge and walked me around a couple times, and proceeded to try and throw me over the bridge. There was basically four that were involved, and they got in a couple of really good grabs on my personal body, and tried to throw me over the bridge."[3]

None of the 35 or 40 onlookers came to the plaintiff's rescue.[4] The only help the plaintiff received was from the young man who let the plaintiff use his room as a dressing room. He was knocked aside in the melee on the footbridge.

After the one futile attempt the young men finally threw the plaintiff off the bridge into the mill race. The plaintiff testified:

"I hit the water, my feet hit some ooze, I came back up, and I swam to the other side, swam, scrambled, crawled. There were rocks in it, so there was a rock piling that I hung on to. * * *"

---

[3] In its brief in this court the defendant claims that the plaintiff's attackers did not chant "rape her" but in fact chanted "race her" meaning to "throw her in the mill race." Apparently the defendant makes this claim for its historical significance because it is not our function to weigh disputed facts on this appeal.

[4] The record is silent as to the whereabouts of Sandra Proudy.

The plaintiff was completely submerged in the water for a moment. She lost her shoes. There was frost on the ground. The plaintiff ran to another street where a police car stopped and the officers helped her.

The first count of the first cause of action of the plaintiff's second amended complaint alleged that the defendant and its agents invited the plaintiff to a social function at the fraternity house where the defendant battered the plaintiff and as a proximate result she suffered specific personal injuries and general damages in the amount of $25,000, loss of work in the amount of $200, medical bills in the amount of $43.85, and punitive damages in the amount of $100,000.

In the second count of the first cause of action,[5] the plaintiff alleged that the defendant was negligent in the following particulars:

"(1)   In serving quantities of alcoholic beverages such that members and pledges of the Fraternity became intoxicated;

"(2)   In serving alcoholic beverages to minor members and pledges of the Fraternity;

"(3)   In failing to provide proper protection for Plaintiff knowing that members and pledges of the Fraternity were intoxicated, rowdy, and assaultive before Plaintiff's arrival;

"(4)   In failing to stop the assaults on Plaintiff when they were in a position to do so after the assaults began."

The defendant's answer was a general denial.

The plaintiff states that the questions on appeal are: Was there sufficient evidence presented at the trial

---

[5] The plaintiff's second cause of action is apparently an action for outrageous conduct causing severe emotional distress. *Rockhill v. Pollard,* 259 Or 54, 485 P2d 28 (1971). This cause of action is also based upon allegations that the members of the local fraternity are the agents of the defendant. The plaintiff in her brief in this court has not argued this cause of action separate from the first cause of action.

The plaintiff's third cause of action seeks to recover damages in the sum of $125 for the loss of her clothing.

There was no attempt by plaintiff to plead or prove that the local fraternity was the alter ego of the defendant Alumni Association. *Cf. Wiener v. Gamma Phi, ATO Frat.,* 258 Or 632, 485 P2d 18 (1971).

from which the jury could have concluded that the defendant Alumni Association should be held (1) vicariously liable for the negligent acts of the fraternity officers and members, or (2) vicariously liable for the reckless, wilful, and intentional torts of the fraternity officers and members, or (3) liable for its own negligence in failing to supervise or control the conduct of the fraternity officers and members?

At least one of these questions must be answered in the affirmative for the plaintiff to prevail on this appeal.

■ . The evidence on the relationship of the defendant Alumni Association to the Beta Rho Chapter of the Beta Theta Phi Fraternity must be viewed in the light most favorable to the plaintiff. *Kirby v. Sonville, supra.*

The articles of incorporation[6] of the defendant Beta Rho Alumni Association adopted in 1914 provide in part:

"The object, business and pursuit of this corporation shall be:
"1.  To develop the physical and mental capacities of its members and the members of the Beta Rho Chapter of Beta Theta Phi Fraternity.
"2.  To purchase, acquire, erect, own, furnish, operate and maintain a chapter house at Eugene, Oregon, for its members and for the members of Beta Rho Chapter of Beta Theta Pi Fraternity."

In 1966 the articles of incorporation were amended to provide that the business and affairs of the incorporation were to be managed by a board of nine trustees and that "the active chapter president and house manager will be ex-officio members of the Board of Trustees."

The initiation and pledge dues of the local fraternity were paid to the national fraternity in Oxford, Ohio. The national fraternity set the rules and regulations for the local fraternity. The payments for room and board by the residents of the house were collected by the officers of the local fraternity. The rent portion of the payments was

---

[6] The articles of incorporation were filed under the authorization of Lord's Oregon Laws 6784 (Religious, Charitable, and Educational Corporations). The amendment to the articles filed in 1966 was pursuant to ORS 61.370 of the Oregon Nonprofit Corporation Act.

forwarded to the defendant and used by it to pay the mortgage and the upkeep on the house. The board portion of the payments was kept by the local chapter and used to pay current expenses. The salaries of the officers of the local chapter in the form of reduction of room and board were set by its membership. In September, 1976, the defendant loaned the local chapter the sum of $2,000. During the time of the incident in question the president of the defendant corporation had been appointed financial adviser to the local fraternity by the national fraternity. In that capacity he advised the officers of the local fraternity on a periodic basis and signed checks for the payment of current expenses. These checks were drawn on the local fraternity's account and the alumni advisor was the sole signer.

It is the plaintiff's theory that the defendant was *operating* a chapter house for the Beta Rho Fraternity and therefore the officers and members of the local chapter were the agents of the defendant.

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency, § 1, ch 1, at 7, (1958).

"A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master." Restatement (Second) of Agency, § 2, ch 1, at 12 (1958).

The distinction between principal and agent and master and servant is drawn in *Kowaleski v. Kowaleski,* 235 Or 454, 385 P2d 611 (1963), at 457:

"* * * All servants are agents and all masters, principals. However, all principals and agents are not also masters and servants. The Comment to § 250, 1 Restatement 2d 549-550, Agency, states the distinction as follows:

" 'A principal employing another to achieve a result but not controlling or having the right to control the details of his physical movements is not responsible for incidental negligence while such person is conducting the authorized transaction. Thus, the principal is not liable for the negligent physical conduct of an attorney, a broker, a factor, or a rental agent, as such. In their movements and their

control of physical forces, they are in the relation of independent contractors to the principal. *It is only when to the relation of principal and agent there is added that right to control physical details as to the manner of performance which is characteristic of the relation of master and servant that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor. * * *'* "* (Emphasis supplied.)

Thus the plaintiff must prove not only that an agency relationship existed between the defendant and the members of the local fraternity, but also that the defendant had a right to control the physical details of the members' actions as in the relationship of master and servant.

■  The evidence in this case and the inferences to be drawn therefrom do not show that the defendant had the right to control the actions of the officers and members of the local fraternity. The plaintiff points out that the articles of incorporation provide that one of the purposes of the defendant was to "own, furnish, operate * * * a chapter house for the members of Beta Rho * * *." The inference cannot be drawn that the intentions of the defendant corporation in 1914 were actually being carried out in 1976. There is no evidence that the defendant was "operating" the chapter house. The mere fact that the defendant owned and furnished the house does not make the members of the local fraternity agents of the defendant.

The evidence is undisputed that the chapter president's and house manager's positions as ex-officio members of the board of trustees of the defendant corporation were advisory only without the right to vote.

The day-to-day functions of the local chapter were not under the control of the defendant. The only business contact between the two organizations was the forwarding of the collected room rent to the defendant. The president of the defendant while serving as financial advisor to the local chapter was the representative of the national fraternity. The payment of the room rent created the relationship of landlord and tenant. The loan of $2,000 created the relationship of debtor and creditor. These relationships do not necessarily create an agency. We find that the members

and officers of the local fraternity were not the agents or servants of the defendant.[7]

In her third and fourth specifications of the second count of the first cause of action, the plaintiff has alleged that the defendant was negligent in failing to provide protection for the plaintiff knowing that the members and pledges were intoxicated, rowdy, and assaultive before plaintiff's arrival, and in failing to stop the assaults when the defendant was in a position to do so after the assaults began.

The plaintiff argues under these two specifications of negligence that, even if the officers and members of the local fraternity were not the agents of the defendant, the case should have been submitted to the jury because the defendant could be held liable for injuries suffered by the plaintiff by reason of its landlord-tenant relationship with the local fraternity and by reason of its duty to supervise its members.

■ There was no evidence that the defendant knew that the members and pledges were intoxicated, rowdy, and assaultive prior to the plaintiff's arrival at the party. There was no evidence that the defendant knew that the local fraternity was going to have a party. There was no evidence of prior conduct to put the defendant on notice. One witness testified that the local fraternity had the reputation of being probably the rowdiest on the campus. Assuming for the sake of argument that this testimony was relevant, there is nothing in the record to show that the defendant had notice of the reputation. The defendant did not know until after the fact that the plaintiff had attended the party and that she was assaulted.

■ Even if the defendant as landlord of the premises had known that the local fraternity was going to have a party at which intoxicating liquor was served, there would have been no duty to supervise. In *Wiener v. Gamma Phi,*

---

[7] The sole exception could be the officer of the local fraternity who collected the rent money. *See* Illustration No. 3, Restatement (Second) of Agency, § 1, ch 1, at 9 (1958).

Here the acts complained of were obviously beyond the scope of the rent collector's agency.

*ATO Frat.,* 258 Or 632, 641, 485 P2d 18 (1971), the plaintiff sued for personal injuries resulting from an automobile accident. It was alleged that a minor, after consuming a large quantity of alcoholic beverages at a fraternity party, ran his automobile off the road and injured the plaintiff who was a passenger. Some of the defendants owned a recreation ranch 10 miles north of Eugene which they rented to that fraternity. It was alleged that the owners of the ranch knew that intoxicating liquor would be served to minors and that the owners were negligent in failing to adequately supervise the activities on the premises. The trial court sustained a demurrer as to the owners of the ranch. The Supreme Court affirmed:

> "* * * [T]he fact that these defendants furnished the premises for the party should not impose upon them a duty to protect the guests or others from the actions of persons who were allowed to become intoxicated. A failure to supervise would not be negligent because there was no duty to supervise. The premises were rented to the fraternity, and the fraternity gave the party; the fraternity, not the owners of the land, should bear the responsibility for activities of guests who were negligently allowed to become intoxicated." 258 Or at 641.

We find that there was not sufficient evidence to submit this case to the jury. The judgment of involuntary nonsuit was properly entered.

Affirmed.