988 F.2d 121
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
John C. ROBERTSON, Plaintiff-Appellant,
v.
Lonnie BAGWELL, Sr.; Lonnie Bagwell, Jr., dba/T & L Ridge
Company; Northern Quality Cedar Sales, Inc., an
Oregon corporation, Defendant-Appellees.
 No. 91-35917.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 6, 1993.
Decided Feb. 19, 1993.
 
 Appeal from the United States District Court for the District of Oregon; No. CV-89-6151-BU, James M. Burns, District Judge, Presiding.
 D.Or.
 AFFIRMED.
 Before D.W. NELSON, TROTT and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 I.
 BACKGROUND
 
 2
 Plaintiff John Robertson (Robertson), a California resident, sustained a personal injury while acting within the course and scope of his employment as an employee of Central Cal Roofing, a California business. Robertson was to haul a load of cedar shakes from Lonnie Bagwell, Sr. (Bagwell), dba T & L Ridge Co., in Springfield, Oregon, to Central Cal Roofing in California. Northern Quality Cedar Sales (NQCS) had agreed to purchase the shake contract from Bagwell after the truck was loaded. Lonnie Bagwell, Jr. (Bagwell Jr.), was loading the shakes onto the truck and struck Robertson with a forklift.
 
 
 3
 Robertson filed suit against the Bagwells and NQCS. After hearing evidence on liability in a bifurcated jury trial, the district court granted NQCS's motion for a directed verdict. The district court then granted Robertson's motion to dismiss the action against the Bagwells. Robertson appeals the directed verdict in favor of NQCS, alleging three separate theories of liability: (1) partnership or joint venture; (2) vicarious liability; and (3) the Oregon Employer Liability Act.
 
 
 4
 The district court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291 and now affirm.
 
 II.
 APPLICABLE LAW AND STANDARD OF REVIEW
 
 5
 Because this is a diversity action, we apply Oregon law. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). We review de novo the propriety of a directed verdict. Meehan v. County of Los Angeles, 856 F.2d 102, 106 (9th Cir.1988). In reviewing the district court's ruling on a motion for directed verdict, our review is identical to that of the district court:
 
 
 6
 A directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict. It is inappropriate if there is substantial evidence to support a verdict for the non-moving party. We consider all of the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Peterson v. Kennedy, 771 F.2d 1244, 1256 (9th Cir.1985) (citations omitted), cert. denied, 475 U.S. 1122 (1986). We review de novo the district court's determination and application of state law. Los Angeles Memorial Coliseum Comm'n v. National Football League, 791 F.2d 1356, 1360 (9th Cir.1986), cert. denied, 484 U.S. 826 (1987).
 
 III.
 DISCUSSION
 A. Partnership/Joint Venture
 
 7
 Robertson contends that NQCS and Bagwell were either partners or joint venturers because they shared profits from the transactions in which NQCS purchased cedar shake contracts from Bagwell, including the Central Cal Roofing contract. Consequently, Robertson claims that NQCS is liable as a partner[1] or joint venturer[2] for his injury. We disagree.
 
 
 8
 The rules which apply in determining the existence of a partnership also apply in determining the existence of a joint venture. Hayes v. Killinger, 385 P.2d 747, 750 (Or.1963). A joint venture is a partnership which exists for the purpose of pursuing a single business transaction. Stone-Fox, Inc. v. Vandehey Development Co., 626 P.2d 1365, 1367 (Or.1981). Thus, the following analysis applies equally to a partnership or joint venture.
 
 
 9
 What constitutes a partnership is a matter of law; however, whether such a relationship exists given the evidence of a particular case is a matter of fact for the jury, unless reasonable men would reach only one conclusion as to the existence of a partnership. Hayes, 385 P.2d at 750. Section 68.120 of the Oregon Revised Statutes guides us in determining whether a partnership exists:
 
 
 10
 (3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.
 
 
 11
 (4) The receipt by a person of a share of the profits of business is prima facie evidence that the person is a partner in the business....
 
 
 12
 Or.Rev.Stat. § 68.120(3)-(4) (1991). In addition, Oregon courts examine four factors to determine whether there is a partnership: (1) intent to create a partnership; (2) right to share in the profits; (3) obligation to share in the losses; and (4) right to exert some control over the business operations. Hayes, 385 P.2d at 750.
 
 
 13
 (1) Intent
 
 
 14
 Although "we should not surprise the parties into [a partnership] against their will.... [T]he substance of legal intent rather than the actual intent may be controlling." Id. In the absence of an express agreement, the status of the parties "may be inferred from the conduct of the parties in relation to themselves and to third parties." Id.
 
 
 15
 After examining the record, we find no evidence to suggest Bagwell and NQCS intended to create a partnership, neither in their dealings with each other nor in their dealings with third parties. As the following factors make clear, the "substance of legal intent" does not indicate the existence of either a partnership or a joint venture.
 
 
 16
 (2) Right to Share Profits
 
 
 17
 The fact that a party receives a share of the profits in a business or venture as compensation for his services does not in and of itself make him a partner. Id. at 751. "In other words, in order to establish prima facie evidence that a party is a co-partner, it must appear his right to share in the profits results from the fact he is a part owner of them." Id.
 
 
 18
 In the present case, the district court found the "finder's fee" which NQCS paid Bagwell was determined by subtracting the cost of goods sold from the gross sale proceeds and taking 50% of the result. Thus, because Bagwell received a percentage of the net profits, there is prima facie evidence of a partnership. Or.Rev.Stat. § 68.120(4). Nonetheless, the fact that NQCS paid Bagwell his finder's fee regardless of whether NQCS received payment for the shakes indicates that he merely received compensation for his services: "[t]he weight of authority seems to be that the presumption arising from a profit sharing agreement is rebutted by a mere showing that the only consideration for the agreement was the rendition of services." Hayes, 385 P.2d at 751 (quotation and citation omitted).
 
 
 19
 In holding that no joint venture existed, the Hayes court reasoned that
 
 
 20
 [t]he profits derived from the operation by [the Killingers and Wallace] respectively were calculated independently and it is easily possible one could have suffered a loss while the other realized a gain. The amount that Wallace received was not his share of the profits as such but compensation for his services in hauling the corn.
 
 
 21
 Id.
 
 
 22
 Similarly, in the present case, Bagwell operated his business independent of NQCS's business and he calculated his own profits after NQCS paid him. He paid his own bills, including telephone bills and loading costs. See id. at 749 (Wallace deducted all of the incidental expenses related to operation of the truck, such as oil, gas, repairs, and insurance, and his profit was the amount remaining after his expenses were paid). Bagwell provided a service for NQCS, i.e. locating a buyer for NQCS or other customers and then loading the shakes for the buyer at which time NQCS would purchase the contract, assume control of the operation and collect the money from the purchaser. Bagwell was compensated for his services based upon a percentage of the shakes sold.
 
 
 23
 (3) Right to Share Losses
 
 
 24
 Robertson argues that if Central Cal Roofing failed to pay NQCS, Bagwell stood to lose his share of the profits, and thus Bagwell shared in the losses with NQCS. However, NQCS owed Bagwell the finder's fee regardless of whether the buyer paid NQCS. Furthermore, Bagwell testified that once the shakes were loaded, he no longer had any risk. Therefore, Bagwell would not share the loss if the buyers, in this case Central Cal Roofing, did not pay NQCS. See Hayes, 385 P.2d at 752 (holding even though the Killingers were not required to pay Wallace if they were not paid, such an arrangement did not constitute a sharing of the losses because there "must be more than simply the loss from an uncollected debt").
 
 
 25
 (4) Right to Exert Control
 
 
 26
 Finally, the right of joint control is indicative of a partnership, although not conclusive. See id. at 753. In this case, there is no evidence that either NQCS or Bagwell had the right to exert control over the operations of the other. In fact, all the evidence reveals that the businesses were entirely independent operations. NQCS did a credit check on all potential buyers and could refuse any buyer, which it had done on several occasions. Such actions are consistent with NQCS ensuring the financial stability of its own business without regard for Bagwell's business. Moreover, testimony from both Gerald Mack (Mack), president of NQCS, and Bagwell clearly indicates that neither party had control over the other's operations, nor with whom they dealt.
 
 
 27
 Robertson has failed to show sufficient commingling of profits, control and risks. Therefore, we conclude there was neither a partnership nor joint venture relationship between Bagwell and NQCS. See Hayes, 385 P.2d at 754 ("[W]e see that in order to create a joint adventure it is not enough that the parties act in concert to achieve some economic objective. The ultimate inquiry is whether the parties manifested by their conduct a desire to commingle their profits, control, and risks in achieving the objective").
 
 B. Vicarious Liability
 
 28
 Robertson next argues that if Bagwell was merely a broker, then because the entire chain of events leading to Robertson's injury was NQCS's operation, it is "directly liable" for his injury. Notwithstanding Robertson's assertion that NQCS is "directly liable," it seems he is essentially arguing that because Bagwell was an agent (broker) for NQCS, NQCS is vicariously liable as a principal. In its conclusions of law, the district court specifically held Bagwell was not an agent or employee of NQCS at the time of the accident. We agree with the district court.
 
 
 29
 The Restatement (Second) of Agency provides that "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). This section of the Restatement has been quoted by the Oregon courts in Stein v. Beta Rho Alumni Ass'n, Inc., 621 P.2d 632, 636 (Or.Ct.App.1980). Three factual elements are required to create an agency: (1) the principal's manifestation that the agent is to act on his behalf; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to control the undertaking. Id. at § 1 cmt. b. "[A]gency can be proved by circumstances and the course of dealing between the parties." Briggs v. Morgan, 496 P.2d 17, 20 (Or.1972).
 
 
 30
 In the present case, there is no evidence that NQCS manifested an intent to have Bagwell act on its behalf, nor is there evidence that Bagwell agreed to act on behalf of NQCS. In fact, Mack testified that Bagwell has never been NQCS's agent. Furthermore, the facts do not indicate NQCS controlled the entire operation. It controlled only its business interest in purchasing profitable shake contracts. Robertson contends that because 33% of NQCS's gross income for the twelve months preceding the accident was attributed to Bagwell's efforts in obtaining contracts and selling them to NQCS, such a history of business transactions indicates either a partnership, agency or joint venture relationship. However, previous course of dealing with an alleged principal is not enough to establish an agency relationship.
 
 
 31
 Moreover, the Restatement has a provision dealing with a situation analogous to the present case. It states that "[o]ne who contracts to acquire property from a third person and convey it to another is the agent of the other only if it is agreed that he is to act primarily for the benefit of the other and not for himself." Restatement (Second) of Agency § 14K (1958) (emphasis added). In this case, Bagwell entered into shake contracts and conveyed some of those contracts to NQCS when NQCS chose to purchase them. Bagwell acted primarily for his own benefit and not the benefit of NQCS.
 
 The comment to § 14K is instructive:
 
 32
 Typical situations to which the rule stated in this Section apply are the purchase of shares in a corporation through a dealer or the purchase of land through a broker. Factors indicating that the one who is to acquire the property and transfer it to the other is selling to, and not acting as agent for, the other are: (1) That he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property. None of these factors is conclusive.
 
 
 33
 Id. at cmt. a. See also Briggs, 496 P.2d at 20 (applying factors set forth in § 14K and holding no agency existed where defendant purchased land from plaintiffs and then sold it for a higher price to codefendant).
 
 
 34
 (1) Fixed Price
 
 
 35
 Even though the fee Bagwell received was not determined until the actual amount of shakes being shipped was known, it was nonetheless a "fixed price" because it was based upon a fixed percentage of the sale proceeds. Moreover, as noted in the previous section, Bagwell received the fee regardless of whether NQCS was paid.
 
 
 36
 (2) Dealing in Own Name
 
 
 37
 The district court found that at the time of the accident, the shakes had been purchased from Bagwell by Central Cal Roofing. It was only after ownership had passed from Bagwell to Central Cal Roofing that the agreement was formalized between NQCS and Bagwell, whereby NQCS would purchase the shake contract from Bagwell. Hence, Bagwell acted in his own name and had the ability to transfer title to the shakes, which he would do if NQCS agreed.
 
 
 38
 We also note that although Bagwell had purchased the majority of the shakes being sold to Central Cal Roofing from 4B Cedar, some of the shakes loaded were owned by NQCS. However, this fact alone is not enough to indicate an agency. Bagwell testified that NQCS's shakes were only stored on his property and that he could not sell the shakes on NQCS's behalf; rather, Bagwell was required to get permission from NQCS before he could sell its shakes.
 
 
 39
 (3) Independent Business
 
 
 40
 As previously noted, the evidence indicates that Bagwell had his own independent business operation buying and selling shakes with neither party controlling the other's operations. Furthermore, there is no indication that Bagwell could bind NQCS. For example, NQCS was solely responsible for approving the credit-worthiness of potential customers and for determining whether a deal would be consummated. Bagwell could not consummate a deal on behalf of NQCS and, absent evidence that Bagwell had authority to act on its behalf, there was no agency. Therefore, NQCS is not vicariously liable as a principal for the torts of its alleged agent, Bagwell.
 
 C. Employer's Liability Act
 
 41
 Finally, Robertson argues that NQCS is liable under the Oregon Employer's Liability Act (ELA) because NQCS and Central Cal Roofing were involved in a "common enterprise." Again, we disagree.
 
 The ELA provides:
 
 42
 Generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.
 
 
 43
 Or.Rev.Stat. § 654.305 (1991).
 
 
 44
 Under the ELA, an injured worker can maintain an action against a third-party employer when his employment or duties require him to be around machinery or expose him to hazardous conditions of an employer other than his own. Sacher v. Bohemia, Inc., 731 P.2d 434, 437-38 (Or.1987). The Oregon Supreme Court has established prerequisites for imposing liability upon a defendant other than an employer of the injured worker:
 
 
 45
 Before the ELA can be made the basis of a claim for relief by an injured worker suing a defendant other than an employer of the worker, however, the defendant must be in charge of or have responsibility for work involving risk or danger in either (a) a situation where defendant and plaintiff's employer are simultaneously engaged in carrying out work on a common enterprise, or (b) a situation in which the defendant retains a right to control or actually exercises control as to the manner or method in which the risk-producing activity is performed.
 
 
 46
 Miller v. Georgia-Pacific Corp., 662 P.2d 718, 720 (Or.1983).
 
 
 47
 In Myers v. Staub, 272 P.2d 203 (Or.1954), the Oregon Supreme Court stated that "control of the instrumentality involved is the essential element to a cause of action under the Employers' Liability Law against a defendant who is not the employer of the injured employee." Id. at 208. Myers defined "control" as "primary control of the physical instrumentalities immediately in use and which are the media of the injuries or death giving rise to a claim of damage under that law." Id. at 209. The court also noted that ownership, as well as control, is a key element in basing liability upon the ELA. Id. at 207.
 
 
 48
 Robertson cannot succeed in his ELA claim against NQCS because there is no evidence that NQCS was in charge of or had responsibility for loading the shakes onto the truck. It had no control over the instrumentality (forklift) which caused Robertson's injury because NQCS assumed control as well as the risk after the shakes were loaded. Bagwell testified that NQCS had no control over the loading operations. Therefore, prior to loading, NQCS had no authority to supervise the loading activities and cannot be held liable under the ELA.
 
 
 49
 Robertson relies on the Oregon Supreme Court decision in Rorvik v. North Pac. Lumber Co., 190 P. 331 (Or.1920), overruled on other grounds by, Hansen v. Hayes, 154 P.2d 202, 213-14 (Or.1944).[3] He asserts the two cases are factually analogous in that like the employers in Rorvik, NQCS and Central Cal Roofing had "interlocking interests" and their employees were engaged in a "common enterprise." However, notwithstanding his effort to align the parties in this case with those in Rorvik, that case is distinguishable. In Rorvik, the employees of the steamship and the employees of the lumber company, which was ultimately held liable under ELA for the steamship captain's injury, were working side-by-side to load the lumber. Unlike Rorvik, in this case, NQCS had no employees helping load the shakes. Bagwell Jr., who was not NQCS's employee, was operating the forklift and Robertson was helping.
 
 
 50
 Moreover, for NQCS to be held liable under the "common enterprise" theory, there must be more than employees working together in furtherance of the common objective: "[t]he defendant's control must create the risk of danger which resulted in the plaintiff's injury." Sacher, 731 P.2d at 439. Although Mack testified that there is risk of danger involved in the operation of a forklift, NQCS did not create that risk of danger because it had no control over the forklift operations.
 
 
 51
 Finally, Robertson claims the district court erred in refusing to grant his motion to compel "contention" interrogatories. Because we affirm the directed verdict, we do not address that issue.
 
 CONCLUSION
 
 52
 After considering the evidence in the light most favorable to Robertson, the record does not indicate the existence of a partnership, joint venture or agency relationship between Bagwell and NQCS. Furthermore, Robertson cannot recover under the ELA because he has not established the "control" element required under that act. Therefore, we conclude that the district court did not err in granting a directed verdict in favor of NQCS.
 
 
 53
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 NQCS would be liable as a partner pursuant to Or.Rev.Stat. § 68.250 (1991), which provides:
 [w]here, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with any authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership ... the partnership is liable therefore to the same extent as the partner so acting or omitting to act.
 
 
 [2]
 The law of partnership governs joint ventures; therefore, a joint venturer would be liable to the same extent as a partner. See Fitzgibbon v. Carey, 688 P.2d 1367, 1370 (Or.Ct.App.1984)
 
 
 [3]
 In this subsequent case, Rorvik was overruled only as to a damage issue not relevant here. Hansen, 154 P.2d at 213-14 (overruling Rorvik insofar as its holding that damages under ELA are measured by the "benefit of the estate" rule)